We'll hear argument next in Gale v. Pfizer Inc., 21383. Mr. Altman. Good morning, Your Honors, Keith Altman on behalf of the Plaintiff Appellates. May it please the Court. It has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the contents of its label at all times. It is charged with both crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market. These were the words of the Supreme Court in Wyatt v. Levine, 555 U.S. 570. Those words are the law of the land and make perfect sense in the regulatory environment of today. 6,000 unlabeled serious reports of diabetes should not be dismissed as not being new information as a matter of law absent more. The crux of the district court's decision dismissing plaintiff's case was that the 6,000 reports cannot constitute new information. This determination was erroneous and diabetes is not in the U.S. label despite that the label in the European Union makes clear that Lipitor is an important identified risk of diabetes. There is one immutable fact that both the district court and Pfizer avoid. To this day, diabetes is not contained in the Lipitor label. This is not an argument. When defendant Pfizer sends Lipitor reports to the FDA, Pfizer indicates that diabetes is unlabeled. That is their own admission. Thus, the district court's determination that the label is adequate and plaintiff's claims are preempted is contrary to Appelli's own actions. And with this error, the majority of the district court's opinion falls. Simply put, plaintiff's claims are not preempted because Pfizer did not seek to change the This is a perfect example of the district court making scientific determinations that conflict with those that practice in the field. Although the original complaint was written to comply with New York state law, did not discuss in detail the numbers of adverse event reports constituting the newly acquired information, the proposed amended complaint certainly did. One point of confusion is that the district court opinion, on the one hand, denied plaintiff's request to amend the complaint, but then based this decision in part on the denied proposed amended complaint. Plaintiff's position that the court should have allowed the amendment and this would have been the first time that plaintiffs would have amended their complaint and to suggest futility on the first time doesn't seem to follow. Given the procedural posture of the case at the time of the motion for judgment on the pleadings, plaintiffs never had a meaningful opportunity to amend the complaint. Looking to defendant's answer concerning preemption, defendant included nothing but boilerplate language that claimed plaintiff's claims were preempted, but not explaining how. This is akin to an Iqbal-Kwambley problem, if plaintiff's complaint was that threadbare, assuredly the district court would have taken exception with such conclusory language. The district court should have allowed the amended complaint. Looking to the proposed amended complaint itself, the submission of 6,000 diabetes reports to the FDA as unlabeled events certainly constituted new information. Not only were the events unlabeled, they were identified by the appellee as serious, triggering the requirements to add diabetes to the warning section of the label in accordance with 21 CFR 201.57C6. In the Wyatt v. Levine context, the Supreme Court noted that 20 reports were sufficient to make a labeling change. Furthermore, this counsel was instrumental in the change of the promethazine label, which some 30 per reports. Not only that, um, uh, brother counsel, Mr. Schaffer and I were involved in the gathering. Am I right, Mr. Altman, that, uh, you, uh, the, the argument is that these adverse event reports constitute reasonable evidence of causal association under the regulation? Your honor, what the problem here is that these reports don't just happen in a batch. Yeah, but, but, but answer, answer my question. What we're saying is, is that, is that correct? 6,000 reports in part, it could be reasonable evidence of a causal association, but what the part that's missing is the required analysis of the 6,000 reports that's required under 21 CFR 314.80B, which says all information from any source, foreign and domestic, must be reviewed and considered when determining make a labeling change. It's plaintiff's position that despite all these adverse event reports coming in, that Pfizer did not meet its obligation to change the label. Now, this is not something that is, um, you know, let's say, so you're, you're, you're really pointing to the cumulative nature or number of these adverse event reports, not the adverse event reports themselves, because as I understand it, uh, the regulation makes it pretty clear that, um, the adverse event reports aren't statements regarding, or don't really, um, uh, don't reflect a statement regarding causation. That's true, but they do need to be considered in conjunction with other, with other information. But I do want to point out adverse event reports themselves lead to labeling changes, the promethazine label. And I personally did the analysis that the FDA, that the was in the Supreme Court brief and that the FDA relied upon showing that just a simple listing of 30 adverse event reports and showing that, you know, the effects that happened, they changed the label based upon that. So it's not, you just can't say as a matter of law, though, is the issue here, your honor, that 6,000 reports cannot constitute new information and cannot say that it needs to be, that the label needs to be changed. It's what did Pfizer do in response to receiving the 6,000 reports, which they themselves acknowledge are not in the label. Certainly- Now the district court, right, uh, counsel, the district court says, uh, plaintiffs offer no analysis on the adverse event reports. You spoke, uh, to this, uh, a moment ago, and I was wondering if you could clarify that. Instead, they merely proffer the adverse, adverse event reports by themselves to conclude that Pfizer could have updated the liberator label. Under the applicable regulations in case law, plaintiff's argument misses the mark. Your honor, I don't, I don't agree with that at all as being a practicing person in pharmacovigilance. The point is, is that the court seems to be focused on that pharmacovigilance, safety surveillance is nothing more than the collection of adverse event reports and the submission to the FDA. And that's the end of the process. It is the analysis of those adverse event reports that constitutes the magic here. And as a matter of law, it is impossible to determine that the motion for judgment on the pleadings without any discovery, whether the 6,000 reports themselves were adequate by themselves. The question is, is what did Pfizer do in response to the 6,000 adverse event reports? Did they properly analyze them? Is it, isn't the first question whether, uh, on the face of the complaint, um, there's some showing or some allegation that the incident reports, the adverse reports, uh, showed that the diabetes was more severe and more frequent than the risk of diabetes that the FDA already examined, uh, actually with the first label. First of all, your honor, the 6,000 reports came in after the 2012 labeling change, which does not contain a warning for diabetes. It is unquestionable. Pfizer concedes diabetes is not in the label. So there's not a question here, you know, that the other cases referred to by the district court and, you know, in Pfizer's brief are examples where the warning, you know, the event was in the label and maybe it wasn't in the right place. Diabetes is not in the label. Pfizer says that every time Pfizer sends a diabetes report to the FDA today, they tell Pfizer diabetes is not in the label. So we're dealing with, you know, a little bit of a different circumstance as with some of the other cases here. But the whole point here is the analysis. Another example was with the gabapentin litigation, I personal submitted 258 suicide death reports with suicide reports with death certificates attached. The adverse events themselves did not cause the labeling change, but as a result of those adverse event reports, the FDA asked all the manufacturers to analyze all their clinical trial data. And lo and behold, when they did that, they find that there actually is an increased risk of suicidal behavior and the label gets changed. So the point here is that you just can't determine on its face without the absence of what they did with these adverse event reports to conclude that this does not constitute information. The fact the FDA itself says even a single one well-documented adverse event can constitute enough information to change the label. That seems to me to be a red herring. But how does the pleading show that the information contained in the adverse event reports shows a different type, a risk of a different type or greater severity or frequency than previously included in the submissions to the FDA? Diabetes is not in the label, your honor. No, no, but it doesn't say in the label. It says if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to the FDA, you're treating it as if it said than what is contained in the label as presently approved. But it doesn't say that. It makes a comparison with what has been shown to the FDA previously. And I don't understand at all how you argue that what is how you substantiate the argument that what is contained in these adverse information reports shows a greater severity or frequency than previously included in submissions to the FDA. Your honor, the promethazine example I used before, all 30 adverse event reports that I based that analysis on came out of the publicly available FDA database. The FDA had every one of those reports. That's where I got them from. And based upon my analysis of the information already in the FDA's possession, the label was changed. The point being here is the company has the obligation to not just collect and submit adverse event reports, they must analyze them. Well, you're telling me what you're saying is this the language that I read to you should simply be disregarded? No, what I'm saying is it's more than just simply the reports. It's the analysis of the reports. And it's all over why versus Levine that the analysis of new information can constitute new information. So let's say, for example, the company has the obligation on the 314.80 to review all adverse event information and analyze. If they do an analysis, and they come up with it, there is an increased risk based on the adverse event information, or for example, the adverse event information says, let's go to the clinical trial date. And let's review our clinical trials. Keep one thing in mind, your honors. Clinical trials are not designed to detect rare adverse events. It's a it's an absolute fact. Rare adverse events come out from postmarketing surveillance, which is what happened here. The point is, is that it is not, you know, the Supreme Court made clear in Wyatt versus Levine, that analysis of new information constitutes new information. The company is required to analyze by the court, you know, with what you're suggesting there, they can stick their head in the sand. As long as they report every adverse event report they get, they send it to the FDA, then they're absolved of any further responsibility. And so your argument that you draw from Wyatt, which I, I'm not sure that I fully appreciated from the briefing, is less related to the label, and more related more to join the meeting. And related more to Pfizer's alleged refusal or failure to analyze fully in the way you'd these adverse event reports. Is that right? 100 percent, your honor. And I think if we didn't make it clear in the briefing, it is certainly clear in the complaints that that is the crux, that it is not just simply bringing in the adverse event reports and sending them in. More is required. But isn't that crucial? Isn't the crucial issue whether Pfizer was authorized to make a label change on its own without FDA approval? Because even if you're right, even if you're right that they should have analyzed more and asked the FDA for permission to change the label based on what they had learned from these reports, still that would not allow them to change the label without permission. And as I understand it, the regulations do not permit unilateral change of the label unless the standard that I read to you before is met. Correct, your honor. So let's take the promethazine example. There's 30 reports already in the FDA database. I took those 30 reports, I analyzed them, and I showed that there was a problem not previously not properly categorized. That constituted new information. 21 CFR 314.70 makes it clear that without permission from the FDA, a company can add or strengthen the warning with the label. Now take these pieces together. They get these adverse event report information. They are required under 314.80b to analyze this information. That is the source of labeling changes. They don't just happen spontaneously. It's because somebody reviews the information. So the company goes and reviews the information. What will be learned from discovery is just what did the company do with respect to the ever mounting increase in information about diabetes. One of the things to point out, it's extremely important. In the European Union, Lipitor is an important identified risk of diabetes. That means that it has been scientifically determined that the risk of diabetes has increased through the use of Lipitor. That information is not in the U.S. label. So certainly, you know, you can certainly take that fact, and it's a statement of causation that exists, that there's adequate studies, that there's adequate adverse events. It doesn't just happen that somebody throws it on there. That information is not in the U.S. label. So what is the, now I'm somewhat confused, Mr. Altman, and I'm sure that it's my problem, not yours, immediately. I doubt it, your honor. I'm sure it's mine. But what is the rule that you would want us to embrace? Because first of all, I'm not sure that we have the rule that I think you want us to embrace, but what is it, first of all? Okay, 21, what is not in dispute here, they received adverse event reports, they sent them into the FDA. Okay, they complied with that. What is not in dispute, that diabetes is not in the label. Because when the company reports it to the FDA, they tell them this is not in the label. This is an unlabeled event. That's not in dispute. What is in dispute is what did the company have to do with respect to bringing these adverse event reports in. 21 CFR 314.80B makes clear that all adverse event information from any source must be reviewed in terms of whether the label needs to be changed. And even if you take the statement from Y versus Levine, that Y versus Levine stands for the proposition, labels are dynamic. You know, it may be adequate today, it may not be adequate tomorrow. And it's the manufacturer's responsibility to see that the label is updated over time, not the FDA's responsibility. So the company is part of the pharmacovigilance. It's not just bringing in adverse event reports. And also, your honor, keep one thing in mind. I don't see how what you're saying now helps you in this suit. Because even if we conclude that Pfizer was wrong and violated statutory and regulatory duties in not reviewing this data and not analyzing the data as a possible source of further submissions to the FDA seeking permission to change the label, that would not establish that they were entitled to change the label unilaterally without permission. And without that, it seems to me you lose your suit. Unless you can show that at a minimum, unless you can show that the newly acquired information revealed matters of a different type and greater severity than previously included in submissions to the FDA, then they're not entitled to make the labeling change on their own. But your honor, isn't that a question of fact? Isn't that something that needs to be determined through discovery? This judge respectfully decided as a matter of law that since he concluded diabetes was in the label in 2012. I think it's a matter of you're not having pleaded anything that shows the meeting of that standard. You haven't pleaded anything that shows that the information contained in these adverse information reports, this newly acquired information, reveals a different type or greater severity of risk than frequently included in the submissions to the FDA. Your complaint, if I'm correct, doesn't address that at all. Well, your honor, we claim that Pfizer had an obligation to review and consider these events and they failed to do so. That it was their obligation. They have all the information. They have information that's not available to me absent discovery. So our contention is that they never properly analyzed the adverse event information, which would be the source of making the labeling change. Well, how do you comply with Iqbal? I mean, this is a problem that all plaintiffs have. All plaintiffs allege matter. Not all, but in many circumstances, plaintiffs allege a matter that depends on information that's largely in the possession of the defendant. But Iqbal requires that the pleading contain allegations of fact, which would make plausible the meeting of the standard. And you're saying, well, we didn't have the information. The defendants had the information. Well, that's what many plaintiffs would say that. But that's what there's no question that Twombly and Iqbal made things harder for plaintiffs. But that's what we're all stuck with. You as a plaintiff's lawyer, me as a judge, we need to abide by that standard because the Supreme Court says it. Your honor, the Supreme Court says 20 adverse event reports can be enough to change. Well, it can constitute. Well, yes, it depends what they say. It depends what they say and how it and how it compares to what has been previously included in submissions. Nobody is saying, or at least I'm not, I'm not saying or thinking that that adverse events reports are incapable of showing matter that would permit a unilateral change. It's a question of whether this one did. Right. And isn't that a question? But your honor, isn't that a question of fact? There's a question of fact as to which the complaint is required to plead facts that plausibly support that conclusion. And we do, your honor. We say there are 6,000 unlabeled adverse event reports. We say that Pfizer did not analyze the information. We say that had Pfizer analyzed the information, they would have concluded that the label needed to be changed. We talk about the fact that in the European Union, Lipitor is an identified risk for diabetes, which is not contained in the US label. I don't know what more we need to say. I mean, the fact that, you know, it's almost conclusive that the, in the European Union, the label contains exactly the warning that should be contained in the United States. How can we say, how can we, you know, how can we say that, you know, as a matter of are not adequate when considering what's going on in the European Union? I know the problem or one issue, one hurdle potentially, is that we seem to have said that these adverse reports do not constitute reasonable evidence of a causal association. They may, and I understand that, you know, I believe what your argument is that accumulatively they may show that. But adverse event reports by themselves don't show the type of causation that would trigger some of these other requirements on the part of Pfizer. Your Honor, that's not a, respectfully, that's not a correct scientific approach. As I said, the Supreme Court denoted 20 reports in Wyatt versus Levine. I caused a labeling change made on 30 adverse event reports that were already in the possession of the FDA. The FDA itself comes out and says even a single well-documented adverse event can establish a causal relationship. So I just think that these are answers that could be answered as matters of law. They require a factual... Well, why don't we hear from Mr. Scheffo and Pfizer, and then you've reserved two minutes for rebuttal, so we'll be able to get that. Mr. Scheffo. Thank you, Your Honor. Good morning, and may it please the Court. My name is Mark Scheffo, and I represent Defendant Apolli Pfizer. I'm going to scrap most of where I was going to start and go through some of what to many might be a little complicated, because obviously it's very clear to me that the panel understands the rubric of this. And frankly, we disagree about a number of things, Mr. Altman and I, but we actually agree on the framework in terms of what the Gibbons case has laid out. And I'm going to focus really, I think, obviously, unless the panel has some specific questions, on the two things that I think Judge LaValle raised pleading. And then, Your Honor, Judge Lawyer, that you talked about kind of the analysis point, and Mr. Altman talked about that. The first is, I think it was correctly stated, frankly, better than I can. A lot of this is an allegation that something should have been done. That's a different claim, right? What we've talked about is failure to warn claims, and the Gibbons court said this in its very recent decision, that there has to be both adverse events and an analysis of them, not a claim that someone could have, should have, would have. Because the whole point here, right, is that in order to get past, frankly, Wythe versus Levine, the Gibbons case, and the factors, you have to basically show that this is very serious. Pfizer, for example, could have had to go and do a CBE, a changes being infected, and just change its label, right? And you would have had to show some type of analysis, and there's the various factors. It has to be information that was new, that wasn't provided. It has to be of a different severity or kind of gravity. And as Your Honor, Judge Lawyer said, it has to also deal with causality. And as Judge LaValle, I think, articulated very clearly, none of this was alleged. All we have is our allegations that there are 6,000 adverse events out there. I mean, that's basically it. And, you know, just to address the point of amendment, I think this is kind of a distinction without a difference. It's not a case where Judge Pauley didn't have any information about what the amendment would have looked like. In fact, Mr. Altman attached his proposed amended complaint, and Judge LaValle recognized it. Mr. Sheffield, let me just ask you, maybe it's a flip side of my question to Mr. Altman. Isn't there a point which adverse event reports might be or constitute reasonable evidence of causal association, notwithstanding some of the language that I've seen? Yeah, so to answer your question directly, Your Honor, yeah, I mean, our position is we're not asking this court, or frankly, any court, to draw a bright line saying, if it's adverse event reports, you can never have a CBE. I don't think anyone's suggesting that, right? There could be situations. But what I think you have to have, and the examples that Mr. Altman, and I have a lot of respect for Mr. Altman, that he gave is in these other litigations, some of which I've been involved with him with, he kept using the word analysis, right? I took these adverse events, and then I analyzed them. If you look at, in the Gibbons case, there actually was reports, and there were adverse events, right? But they determined that there was not enough to pass the standard for CBEs. So to answer your question directly, Your Honor, it's not just a number, and just as a footnote, right? Let's talk about those for a second. The 6,000 adverse event reports, there was a multi-district litigation that I was involved in, Mr. Altman was involved in. It started in 2013. Every time somebody files a complaint, that becomes an adverse event, right? You have to file it. And that ultimately, that case, Judge Gergel in South Carolina, after hearings and expert reports, dismissed all of their experts, or granted that the Dalbert motions in whole or part of all of their experts, the cases were ultimately dismissed on summary judgment affirmed by the Fourth Circuit. So I just tell the court that just because this is not a situation where all things are being equal. I would agree that the quality and kind of importance, perhaps, of 50 adverse events that were generated as a result of a trial or study could have a different significance. So would I be, if I may just interrupt you with a question, would I be correct in understanding this as the precedent and standard, not as meaning that adverse events reports are incapable of addressing or affecting causation? It's that they don't necessarily address causation. The fact that it's an adverse event report can indicate nothing about or little or nothing about causation, but some can. And in some instances, it depends on the nature of the adverse information report. And some instances, the adverse information report might give a very clear, might give very clear support for causation. Is that not correct? I think I would generally agree with that, Your Honor. And the reason why the answer is to answer it directly. I think that's correct. Here's what I would say, though. You know, when we look at adverse events and those of us who kind of live in this world, what the FDA says is this is a pharmacovigilance. It's a safety, you know, so we want to encourage people to kind of file these. They could be lawsuits. And as a general matter, this court in Marena and courts around the country have said as a general matter, right, and the FDA guidance says this, we don't look at adverse events reports to determine causation because that's not what they're for. But we're not asking this panel to issue a bright line rule that says, you know, no way, no how if we ever see a case. So I would leave open the possibility in certain situations. But I would also say to you, Your Honor, as a practical matter, they don't. And that's why you had Wyeth. That's why you had Gibbons. And even Mr. Altman said what you need to do is to do an analysis of the adverse event reports because, again, the purpose of them is just literally for people to say, you know, so an adverse event report might say someone came into my office, I was taking Lipitor, and then they were diagnosed with diabetes, right, which is a common comorbidity for people who have high cholesterol and diabetes. After an analysis, it may well be determined that there is a causal connection, but the adverse event reports certainly are not used by the FDA. And if a company said we have a bunch of adverse event reports without analysis, they went in to try to change the label under the CBE, they would be at risk of misbranding, which could, you know, have some serious consequences. The one other thing I would just say. I'm sorry, please go ahead. Just, you mentioned Wyeth, and of course, your brother reads Wyeth to impose a duty on manufacturers to conduct independent analyses of accumulating risk data. What's your view of Wyeth? Well, I actually, you know, I think Wyeth, I mean, remember, Wyeth was around, it's the Supreme Court, and this court in 1999, in, I'm sorry, 2019, in the Gibbons case, certainly quoted from, relied on the Wyeth decision, and basically said that to the extent that really what I've been saying, what I think your Honor has read from these decisions, that to the extent that there are adverse event reports and analysis under certain circumstances, right, here's the difference. If you look at, we cite, we rely on the FDA materials that they looked at. I think it's 266 and 267, and I won't read them all for your Honor, but just to give your Honor some comfort, the idea that this was different, these are some of the things, these are not just adverse event reports, but clinical trials. They're titled things like statins and risk of incident diabetes. Then there's effect of statin on fasting glucose and diabetic and non-diabetic. Statin therapy and risk of developing type 2 diabetes, and it goes on. So what is the point? The point is, these subsequent, Mr. Altman made the point that, well, these somehow were after, but it doesn't matter whether it's before or after. The point is, is this different information? And what we know from the record, and what Judge Pauly knew, was that the FDA took this issue of diabetes. Of course, the companies take it seriously, and the FDA did. And they wrote for us that they looked at all these adverse events, they looked at clinical trials, they looked at analysis, and they made a determination that there was not a labeling requirement for specifically saying diabetes. They did make a label change about high glucose levels, if you will. And that's kind of the whole point of the preemption analysis. Could you, just along those lines, you mentioned the possible, on the back end of this, misbranding or accusations of misbranding. Could you just address that briefly? Yes, Your Honor. So, you know, the companies, you know, you kind of have articulated and understand the dichotomy that, you know, we want the, the FDA is kind of, make sure that the labeling is appropriate. This is not like buying chewing gum, right? I'm not saying my client or any reputable company, but we don't want someone to say, this can cause diabetes, heart disease, X, Y, leukemia, right? Just even if it doesn't, in order to avoid liability, right? So the idea of what, and there's a problem of overwarning. So we want to make sure, and the FDA wants to make sure that there's actually a causal connection between what's on the label and what's not. So that's why, and again, the Gibbons case and Wyeth have determined, companies can't just willy-nilly change their label or add things for any reason or even liability issues. There's certain narrow exceptions that are not preempted. And those exceptions are if it's done pursuant to a CBE, change being effective. And then there are very specific requirements, again, including the fact that it has to be newer, different information than was provided. It has to be something that has a causal connection. It has to be severe. It's kind of what we would want, right? We don't want to say that under no circumstances can a pharmaceutical company ever change the label if it looks at adverse events, does an analysis and determines that there's a causal connection. That would be a responsible thing. But the arguments the plaintiffs are making here is somehow, even though the FDA has looked at the same information, there's nothing new. There's no allegation other than adverse events. There's no allegation that there was any analysis done that would be inconsistent with what the labeling says. So essentially, we have the paradigm kind of Twombly, Iqbal, kind of fishing expedition. I see my time is up, but I could just wrap up in a minute if Your Honor would just give me a minute. I would just say two things. And this is a little more belt and suspenders, if you will. Mr. Altman was involved and had cases in this MDL that we talked about. There was 10 million pages of documents. It was about diabetes. So the idea that we would need discovery to figure that there was expert reports on both sides. I was involved in Daubert hearings for two weeks. So the point is that there's somehow this hidden trove of information. My words, not Mr. Altman's, I think is belied by the fact that there was an MDL with a massive amount of information produced. And then I think I'll just rest on our briefs unless the court has any questions. Does Gibbons resolve this? There seems to be some wiggle room in Gibbons. It's not altogether clear to me that it resolves these specific issues before us. I think, well, you know, look, the law is evolving, Your Honor. So I don't want to be presumptuous and say it's answered all questions. We probably wouldn't be here if it was a complete agreement. But here's what I would say about Gibbons. Totally consistent with Levine, right? And then I think what Gibbons says that's really important. And remember, in Gibbons, you had not only adverse events, but you actually had studies and some level of analysis, right? And the court nonetheless determined even there where you have a wealth more information than here, that it didn't rise to the level of kind of new information or that would allow a CBE. So I think it does give pretty strong guidance. And I think that's essentially where the analysis starts and ends here, you know, with all due respect, right? And Mr. Altman and the plaintiffs have raised other issues about Albrecht. But basically, the question here is, have you first pled information, and you've been given multiple times, that would show that a company, a responsible company, could go and change its label based on that information? And the answer, and Judge Pauly was very careful and considered. He took supplemental briefing. There's also at Appendix 351, we submitted a four-page signals-based letter. And the answer is no. There is no analysis. And again, in closing, unless the court has additional questions, I think we heard this. Can I ask you just a very quick question? Yes, of course. Mr. Loyer, I just want to throw out on the table the whole question of your contention that the plaintiffs, even in their proposed amended complaint, failed to identify when the claims accrued. Yes, so thank you, Your Honor. You know, I, again, I mean this in a professionally courteous, I mean, you know, my guess when I see things like that, and maybe I'm wrong, maybe Mr. Altman will tell us otherwise, is that, you know, being a good lawyer, that he didn't, those complaints you see, a person used a product, and then here's when they were diagnosed or believed that they had an injury, right? That's typical in my world where the case is, there was none of that, right? So it's just, I have these folks. So we did, in the absence of those allegations, make a general statute of limitations claim. And basically what we said was, under New York law, which this was pled under, it's three years. We recognize that if you plead exceptions, there are some, but there are no exceptions pled, though, you know, plaintiffs were given an opportunity to do that. Judge Pauly looked at that. So if you just take a straight application, giving the benefit of the doubt, here's the date when the complaint was filed. We don't know when these people used it. Again, many of the cases that were filed in the MDL, it was people from 2012 and before. I believe Mr. Altman had clients that he filed his case in 2016. So again, I don't know when that is, but I think there's a dual ruling, which is wherever they are, if it's 2016, that would be the only date that they wouldn't be barred based on the filing of the complaint. And that's based on the information that we were given in the complaint, Your Honor. If that answers your question. So again, I appreciate it. I'm sorry I went over, unless Your Honors have additional questions. No apologies. Thank you very much, Mr. Schiff. We'll hear from Mr. Altman. You have two minutes for the vote. Mr. Altman, Your Honor, if I can have just one extra minute to address the misbranding issue, which wasn't even discussed on my end. First of all, I just want to point out that the defendants and the whole pharmaceutical industry very proudly wanted a decision. I believe it's in the Southern District of New York that they could, over FDA objections, despite violating FDA regulations, could promote through off-label indications so long as the So for Brother Counsel to get up here and say that if we put a warning in there that we believe should go in there, and it's truthful that we could be hit with misbranding, it just defies their whole position. Now, coming back to what he said, some of the important stuff, I wanted to point out with Wyeth that the FDA had specifically rejected Wyeth wanting to add and strengthen the warning with respect to amputations prior to the Wyeth versus Levine case coming down. And the Supreme Court specifically addressed that and said that what you did today doesn't necessarily mean that what you've done, that it's okay tomorrow. And so the fact that in 2012, the FDA may have made a pronouncement doesn't mean that's good for all time. My Brother Counsel's suggestion here is that the company should not analyze adverse event information. So long as they get the reports in and they send them in, they have met their duty, and that is not what is required. Now, in terms of the proposed amended complaint, I want to point out, we never had a real opportunity to amend the complaint. Traditionally, they file a motion to dismiss. Is it separate and apart from the complaint that the FDA then itself analyzed these reports? No, no, I didn't say that. No, no, but is it, I'm not saying you said that, but is it correct? No, it's the FDA. The FDA's entire pharmacovigilance team for monitoring about 5,000 active substances is about the same size as Pfizer's. They have about the same number of people between the FDA and Pfizer. You certainly can't expect the FDA to monitor each drug the same level as the manufacturer itself. So with respect to why it was specifically rejected, despite the fact the FDA, the Supreme Court came in and said, what you know today isn't necessarily what's true tomorrow. Our whole point is not just about the adverse events. It's about that Pfizer was required to analyze the adverse events, and they didn't do it. There's no evidence that they did. Brother Counsel said over and over and over again, analysis, analysis, analysis, analysis, where's the analysis? And I want to project out to the endgame. In the European Union, the label says that Lipitor increases the risk of diabetes based on scientific conclusions. So some analysis must have been done. That information is not in the U.S. label. So it's not really, and we mentioned that in the proposed amended complaint. I also want to point out that we really didn't have a meaningful opportunity to amend the complaint. Traditionally, you file a complaint. Defendant does a motion to dismiss. You have an opportunity to amend based upon the motion to dismiss. Here, this complaint was written for New York State Court standards. It was removed by the defendants, who then promptly answered. In their answer, they provide boilerplate preemption arguments. That really doesn't put plaintiff on notice as to what information, what is preempted and how. And then they do a motion for judgment on the pleadings, which does not give us an opportunity to amend the complaint. So the reality is, is we never had an opportunity to amend the complaint in response to a motion to dismiss or something like that. Can we just briefly address this, very briefly address the statute of limitations issue? Your Honor, the statute of limitations is an affirmative defense. Our complaint didn't put in specific dates. It's the defendant's obligation to prove that we are, that the complaints were not timely. And at some point, you know, at some point, they'll be able to address that. I think what's more important, though, is what is the trigger date is really what the question is. You know, what is the date by which you can say the label is adequate? And I come back to one of the things, diabetes is still not in the label. This is not a question of enhancing a warning. When were the plaintiffs diagnosed with diabetes according to the proposed amended complaint? We didn't put that information in the proposed amended complaint, Your Honor, for individual, but most of them were probably diagnosed in the 2013, 14, 15, 16 time frame. That's not in the complaint, okay. It's not in the complaint. And that's an issue that can be addressed. But I don't think that's a basis. I mean, the court, you know, the court can't dismiss the complaint without leave to amend. Based upon that, certainly the court could have said, I want an amended complaint to give me the dates of all the plaintiffs. The court, you know, the court without ever having had an opportunity to amend the complaint, denied the amended complaint and with prejudice, no ability to amend the complaint. I mean, how do you say that the complaint is futile when there's never been any rulings whatsoever, or even a motion to go through? Thank you, Your Honor. Appreciate it. I'd like to ask another question of Pfizer's counsel. Of course. Mr. Chaffo, back on, please. So my question relates to 21 CFR section 314, 3B. And I'm asking, is it Pfizer's position, is it Pfizer's position that under that regulation, Pfizer was without authority to amend the complaint without permission of the FDA, unless, on the basis of this newly acquired information, unless that newly acquired information showed that the studies, events, and analyses revealed risks of a different type or greater severity or frequency than previously included in submissions to the FDA? Is it your position that unless that standard was met, you didn't have authority to amend the complaint, no matter how much analysis you did, you didn't have authority to amend the complaint unilaterally without permission of the FDA? Is that your position? The answer is yes, Your Honor. And I think that standard is essentially the predicate for the Levine case and the Gibbons case and the progeny of cases. So yes, Your Honor. So that even if you, I mean, even if your adversary is correct in saying you should have been doing more analysis, even if that's correct, and I'm not suggesting it is or it isn't, but assuming that it is, you still didn't have authority to unilaterally amend the complaint based on the newly acquired information, unless the newly acquired information met that standard. That's exactly right. And that's really been the point is that, you know, what counsel seems to be saying is I agree the adverse events don't meet the standard, but you should have done something, maybe could have, would have, should have, right? And then you would have had it. But the point is looking straightly, and this is what Judge Pauly looked at, is that everyone agrees you can't, based on this record, they would not have done it, couldn't do it without more. And that's really the basis, I think, of what these cases talk about. It's a limited exception to the preemption rule about how, and you know, it's for the reasons we talked about, I think good policy reasons. And so yes, Your Honor, it was something that the company could not have done unless it made those determinations, which it did not. Thank you. Okay. Thank you. That concludes today's oral argument calendar. This case is deemed submitted. We'll reserve decision. I'll ask the clerk to adjourn court. Courts then adjourn.